## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

WILGOT E. JACOBSSON                                     CIVIL ACTION

VERSUS

TRADITIONS SENIOR MANAGEMENT,                NO. 20-00507-BAJ-RLB
INC., ET AL.

## RULING AND ORDER

This wrongful death action seeks damages from the corporate manager of Nottingham Regional Rehab Center, a nursing home in Baton Rouge, Louisiana. Plaintiff, the son of decedent Patricia K. Jacobsson, alleges that Mrs. Jacobsson's death was the direct result of Defendant Traditions Senior Management, Inc.'s ("TSM") practice of intentionally underfunding and understaffing Nottingham Center in order to maximize profit.

Now before the Court is TSM's **Re-Urged Rule 12(b)(6) Motion to Dismiss. (Doc. 26)**, seeking dismissal of Plaintiff's action solely on the basis that Plaintiff's claims "sound in medical malpractice," and therefore must first be presented to a medical review panel pursuant to the Louisiana Medical Malpractice Act, La. R.S. § 40:1231.1, *et seq.* ("LMMA"). Plaintiff opposes TSM's Motion. (Doc. 28). For reasons to follow, TSM's Motion will be denied, and this matter will be referred to the Magistrate Judge for entry of a trial date and related discovery deadlines.

### I.    ALLEGATIONS

The following allegations are drawn from Plaintiff's original Petition For Wrongful Death And Survivor's Damages (Doc. 1-4 at pp. 50-59, the "Petition"), and

accepted as true for present purposes.

TSM is a Florida corporation that contracts to provide management services to nursing homes, including Nottingham Center. (Petition at ¶ 1). In its management role, TSM exclusively "determine[s] and control[s]: the numbers of staff allowed to work in their facilities; the expenditures for staffing at their facilities; the revenue targets for each facility; the census mix; and the census targets for each facility." (*Id.* at ¶ 43). When making decisions about business costs—particularly staffing—TSM "focuse[s] on unlawfully increasing [its] earnings . . . as opposed to providing the legally-mandated minimum care … to elder and/or infirm residents in their facilities." (*Id.* at ¶ 18).[1] As a result of TSM's singular "pursuit of profit," its facilities—including Nottingham Center—are underfunded and understaffed, and unable "to meet the acuity needs of [their] residents." (*Id.* at ¶¶ 19, 23). In other words, Nottingham Center's residents are systematically neglected due to TSM's deliberate budgetary decisions. (*Id.* at ¶¶ 27, 41).

TSM's intentional decision to understaff Nottingham Center violates state and federal regulations requiring nursing homes "to maintain adequate numbers of nursing staff in order to provide nursing care to all patients." (Petition at ¶ 20). Moreover, Nottingham Center's persistent understaffing stands in direct contrast to TSM's public marketing materials, which represent that Nottingham Center provides services "in compliance with all applicable federal and state laws, rules, and

---

[1] Plaintiff alleges that TSM's unlawful activities include "siphon[ing] funds and assets away from [Nottingham Center] … under the guise of management and administrative fee expenses"—*i.e.*, "related-party transactions." (Petition at ¶ 26).

regulations." (Petition at ¶ 44).

Mrs. Jacobsson resided at Nottingham Center for approximately four weeks prior to her death on January 23, 2020. (*Id.* at ¶¶ 2, 7). She entered Nottingham Center on December 20, 2019, after undergoing hip surgery at another facility. (*Id.* at 3). In the weeks to follow, Mrs. Jacobsson "contracted Hepatitis A as a result of [Nottingham Center's] failure to provide appropriate infection control." (*Id.* at ¶ 5).

On January 15, 2020, Mrs. Jacobsson was transferred from Nottingham Center "to the Emergency Department at Our Lady of the Lake Regional Medical Center, where she was admitted into the Intensive Care Unit after being diagnosed with Hepatitis A." (*Id.* at ¶ 6). Tragically, she never recovered, and died on January 23, 2020 due to hepatic (liver) failure. (*Id.* at ¶ 7).

## II.    RELEVANT PROCEDURAL HISTORY

Plaintiff's Petition alleges that Mrs. Jacobsson's death "was the direct result and product of the financial and control policies and practices forced upon [Nottingham Center]" by TSM, "which resulted in understaffing in both number and training." (Petition at ¶¶ 16, 32). Plaintiff seeks recovery under various Louisiana law theories, specifically including "administrative negligence" and fraud/misrepresentation. (*Id.* at ¶¶ 10, 44).

Now TSM seeks dismissal of Plaintiff's action solely on the basis that Plaintiff's claims "sound in medical malpractice" and cannot proceed because Plaintiff has not presented them to a medical review panel, as required by the LMMA, La. R.S. § 40:1231.8. (Doc. 26). Plaintiff opposes TSM's motion, arguing that TSM is

not a "qualified medical provider" under Louisiana law, and therefore is not protected by the LMMA; and that, in any event, he has not alleged medical malpractice, and therefore his claims may proceed without having been presented to the medical review panel. (Doc. 28).

## III.    ANALYSIS

### A. Legal Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).

### B. Discussion

In a diversity case such as this, the Court applies state substantive law to determine the viability of all claims and defenses. *In re Katrina Canal Breaches Litig.*,

4

495 F.3d 191, 206 (5th Cir. 2007). Here, the parties agree that Louisiana law controls.

Under the LMMA, a medical malpractice claim against a "private qualified health care provider" must be dismissed as premature "if such claim has not first been presented to a medical review panel." *LaCoste v. Pendleton Methodist Hosp., L.L.C.*, 2007-0008 (La. 9/5/07), 966 So. 2d 519, 523. On the other hand, a party *may* pursue any *other* tort claims—specifically including "administrative negligence"— against  a private qualified health care *without* first presenting such claims to the medical review panel. *See Scio v. Univ. Med. Ctr. Mgmt. Corp.*, 2019-1319 (La. 10/21/19), 280 So. 3d 1135, 2019 WL 5437074. This is because the LMMA's exhaustion requirement applies "*only* to claims 'arising from medical malpractice,' … all other tort liability on the part of the qualified health care provider is governed by general tort law." *LaCoste*, 966 So. 2d at 524.

Here, the parties dispute whether Plaintiff's claims "arise from medical malpractice."[2] To resolve this dispute, the Court conducts a six factor analysis

---

[2] As indicated above, the parties further dispute whether TSM is a "private qualified health care provider" subject to the protections of the LMMA. TSM asserts that it meets the test for coverage under the LMMA because it (1) acts as Nottingham Center's "officer, employee or agent"—thus satisfying the statutory definition of "health care provider," La. R.S. § 40:1231.1(1); and (2) has independently submitted proof of financial responsibility to the Louisiana Patient's Compensation Fund Oversight Board *and* paid the requisite surcharge (thus satisfying the financial aspects for qualification under the LMMA, La. R.S. § 40:1231.2(A)). (Doc. 26 at pp. 4-5). In support of these assertions, TSM submits two "PCF Certifications" stating that Nottingham Center and TSM were each "certified as an Enrollee under La. R.S.40:1231:1 et seq." at all relevant times. (*See* Doc. 27-2; Doc. 27-3).

Plaintiff counters that TSM *cannot* satisfy the statutory definition of "health care provider" because TSM "is not a management company 'whose business is conducted principally by health care providers," rather, it is merely a foreign (Florida) corporation "that provides managerial services to Nottingham Regional Rehab Center as a 'related organization.'" (Doc. 28 at p. 6). In making this argument, Plaintiff does not address the significance (if any) of TSM's "PCF Certification." (*See id.*).

assessing:

> (1) whether the particular wrong is "treatment related" or caused by a dereliction of professional skill;
>
> (2) whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached;
>
> (3) whether the pertinent act or omission involved assessment of the patient's condition;
>
> (4) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform;
>
> (5) whether the injury would have occurred if the patient had not sought treatment; and
>
> (6) whether the tort alleged was intentional.

*LaCoste v. Pendleton Methodist Hosp., L.L.C.*, 2007-0008 (La. 9/5/07), 966 So. 2d 519, 524–25 (citing *Coleman v. Deno*, 2001-1517 (La. 1/25/02), 813 So. 2d 303, 315).

Here, the balance of factors overwhelmingly favors a determination that Plaintiff's claims do *not* "sound in medical malpractice." First, Plaintiff's allegations of mismanagement of Nottingham Center's "funds and assets," unlawful "related-party transactions," and misrepresentation regarding Nottingham Center's compliance with state and federal regulations plainly do not implicate medical treatment or the dereliction of professional medical skill.

Further, even Plaintiff's allegation that Mrs. Jacobsson contracted Hepatitis A

---

The Court need not resolve this dispute, which would benefit from additional factual development. Instead, the Court will *assume* for present purposes that TSM *is* a qualified health care provider under the LMMA. Ultimately, this assumption has no bearing the Court's analysis, however, because Plaintiff's claims do *not* sound in medical malpractice and therefore may proceed regardless of TSM's status as a qualified health care provider (for reasons explained below).

"as a result of [Nottingham Center's] failure to provide appropriate infection control,"
does not implicate medical malpractice when read in context. Instead, this allegation
relates directly to TSM's decision to underfund and understaff Nottingham Center,
which made it *impossible* for Nottingham Center to "meet the acuity needs" of its
residents—including appropriate sanitation and infection control—*regardless* of the
professional medical skill of its employees. (Petition at ¶ 23; *see also id.* at ¶ 25
("[TSM] did not expend the appropriate funds to pay for the proper staffing needed at
[Nottingham Center]."). Put differently, Plaintiff's allegations address system-wide
failures, which Plaintiff attributes to TSM's "pursuit of profit" at the direct expense
of "providing … legally-mandated minimum care." (*Id.* at ¶¶ 18, 19). As set forth in
the relevant Louisiana Supreme Court jurisprudence, such system-wide failures
"suggest premises liability and general negligence rather than a dereliction of
professional medical skill." *See LaCoste*, 966 So. 2d at 526 (plaintiff's allegations
regarding deficient hospital design supported claim of general negligence, not medical
malpractice); *see also Scio*, 2019 WL 5437074 at *1 (plaintiff's allegations that
management corporation defendant "was negligent in failing to implement an
administrative policy" regarding patients' follow-up appointments supported claim of
"administrative negligence," not medical malpractice).

Second, the alleged wrongs do not require expert medical evidence to
determine whether the appropriate standard of care was breached. Notably, Plaintiff
has not named as defendants any medical professionals who might be accused of
breaching the standard of professional medical care when treating Mrs. Jacobsson.

Moreover, even if medical evidence is necessary to establish causation with regard to Mrs. Jacobsson's death, there should be no need for *expert* testimony to establish that Plaintiff contracted Hepatitis A at Nottingham Center. Finally, while Plaintiff's case may benefit from expert testimony to establish TSM's duty (and alleged breach) with regard to funding and staffing (and the laws and regulations regarding the same), sanitation, and infection control, any such expert testimony in these areas could come from a hospital administrator, a public health professional, or some other similarly trained individual.

Third, the pertinent acts and omissions did not involve assessment of Mrs. Jacobsson's condition. Again, Plaintiff's allegations focus on Nottingham Center's underfunding and understaffing, "which predictably and foreseeably  resulted in the neglect of [its] residents," including Mrs. Jacobson. (Petition at ¶ 41). These allegations stand apart from any individual assessment of Mrs. Jacobsson's condition that could have been performed by a Nottingham Center doctor or nurse, and, instead, implicate budgetary decisions made by corporate executives and administrators. Logically, such executives and administrators did not assess Mrs. Jacobsson's medical condition in order to determine whether Nottingham Center's staffing was adequate to serve her needs.

Fourth, the alleged wrongs did not occur in the context of a physician/patient relationship, and were not within the scope of activities that Nottingham Center was authorized to perform. To the contrary, Plaintiff alleges that the fateful decisions to underfund and understaff Nottingham Center, and to misrepresent Nottingham

Center's compliance with state and federal mandates, were *solely* within TSM's control, and therefore *outside* the scope of Nottingham Center's activities. (*See, e.g.*, Petition at ¶¶ 42-44). And, as noted previously, the Petition does not allege that any specific physician or nurse made a particular medical decision that resulted in Mrs. Jacobsson's neglect *or* Nottingham Center's failure to maintain "appropriate infection control."

The fifth factor requires the Court to determine whether Mrs. Jacobsson's injury would have occurred but for her decision to seek treatment at Nottingham Center. At a high level of generality, the answer to this inquiry is "no," insofar as the entire thrust of Plaintiff's Petition is that Mrs. Jacobsson would not have contracted Hepatitis A (and, ultimately, died) had Nottingham Center been properly funded and staffed. Yet, even this factor does not weigh greatly in favor of finding that Plaintiff's Petition sounds in medical malpractice because, as explained above, the particular wrongs alleged are neither treatment related nor the result of a dereliction of professional medical skill. *See LaCoste*, 966 So. 2d at 529.

Finally, Plaintiff's allegations establish the elements of conversion and fraud, each an intentional tort under Louisiana law. Specifically, Plaintiff contends that TSM engaged in unlawful "related party transactions" and "siphoned necessary funds from [Nottingham Center]," "focused on unlawfully increasing the earnings [of Nottingham Center] as opposed to providing the legally-mandated minimum care to [its] residents," and, further, knowingly misrepresented that Nottingham Center operated "in compliance with all applicable federal and state laws, rules, and

regulations," including regulations governing minimum staff. (*See* Petition at ¶¶ 9, 18-20, 26, 44). These allegations plainly remove Plaintiff's Petition from the ambit of mere medical malpractice.

In sum, the foregoing six-factor analysis overwhelmingly supports but one conclusion: Plaintiff's claims do *not* "sound in medical malpractice," and need not be presented to the medical review board.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant Traditions Senior Management, Inc.'s **Re-Urged Rule 12(b)(6) Motion to Dismiss (Doc. 26)** be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that his matter be and is hereby **REFERRED** to the Magistrate Judge for entry of a trial date and related discovery deadlines.

Baton Rouge, Louisiana, this 7th day of March, 2022

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**